Will the attorneys who are going to argue today please approach the bench, identify yourselves and the party you represent, and how much time, indicate to us how much time you want to argue. Remember that the microphone in front of you is for recording purposes only, not for amplification. For the record, Sam Amirante, A-M-I-R-A-N-T-E. I, along with my associates Pamela Kern and Amy Seaman, represent the appellate Jonathan Humenski. How much time would you like? An hour or two hours. We'll look at the rules, Judge, Mr. Justice, in maybe two or three hours. Okay. Twenty minutes. I'll stick to the twenty minutes. Fifteen and five. Yes. Okay. Fifteen and five. Good afternoon, Your Honors. My name is Myles Kelleher from the State's Attorney's Office on behalf of the people. And I anticipate approximately twenty minutes also. Very well. Mr. Amirante. Thank you, Your Honor. May it please the Court, Counsel. As I indicated, I'm Sam Amirante and I represent Jonathan Humenski, the appellate here, who is not present right now. He's on his way. He may have gotten stuck on the train. There's a problem with the Ogilvie Station, I understand. In any event, Jonathan, this young man, is a convicted felon because he was found guilty of committing a battery, as you know from reading our briefs, committing a battery in an establishment called Twin Peaks in Wheeling, Illinois. Twin Peaks is nothing more, nothing less than a tavern. There's some indication in the record that it may be a restaurant where hundreds of people were at the time, but there's also a video that was supplemented in that the trial court looked at. In that video, you can clearly see there's no families or patrons or children, as was indicated in some of the testimony of the purported victim in this case. It's a very simple tavern. There's a two-tiered bar. Very briefly, Mr. Humenski was in there. He got upset with the server behind the bar. She apparently had kept some $12 of his that he didn't want to give her. He thought she was stealing the money. He wanted it back. And he began to call her some very offensive, terrible, terrible names. He was arguing with her, called her names. She gave him the money back. And then there was a manager and another manager who came in the bar, pretty big guys who came in the bar, and Mr. Humenski started to speak with them about this. He was upset. He had been in that place before. And he said he had never been treated like that, so he was telling them about it. And again, his language was offensive. It wasn't right. He was being impolite. Maybe even being disorderly. And at that point, what does an owner of a private establishment like that do? They call 911, call the police, get them out of here. If you don't want to leave, we're going to call the police. Did they do that? No. Instead of doing that, they engaged with him. You say, first of all, this public place of accommodation. In your brief, it got stated that it was not proven beyond a reasonable doubt that this was a public place or an accommodation to sustain the aggravated battery. On what basis do you make that claim? Judge, Justice Harris, it wasn't proven. Number one, the battery itself was improved. If you review the videotape, there was never a striking. There was a finding that my client, Colcott, one of the managers, sponsors, whatever name we want to give them. It didn't happen. He missed. He took a swing, missed. Then he was taken down, not once, but twice. As far as the public place of accommodation, it was very clear. This district itself in People v. Johnson, which we cite in our case, the same as authority, holds, it has held, and has not been reversed, has not been distinguished by any other appellate division in this district since it was decided, quote, a tavern is a private property open to the public for a limited purpose. Now, in that case, of course, there was a stabbing inside a bathroom in the Johnson case, and the court refused to extend a public place of accommodation. Now, we're trying to find out what accommodation means, and I know there's been other cases regarding, you know, the vagueness of the statute and so forth. What is a public place where, you know, should a statute be clear? And we've argued over breadth in our brief, and we argued it in the trial court, too. But the Johnson case refused to extend because, not because this was a bathroom, as I'm sure the state will argue, not because it was a bathroom in a tavern, because it was a tavern. So the tavern is private property. Now, there have been other cases, of course, the state cited Murphy. In their brief, they cited Warren. Warren was a case that basically was trying to decide whether to allow the defendant to amend, or the state to amend the information, the defendant objected to the information being amended there. And in that case, interestingly enough and significantly, the Warren court, although finding that the amendment was being allowed, they said, at no time did Warren, the defendant, appear to base his defense on the nature of the property where the offense occurred. The entire basis of our defense, the ad via battery basis, Mr. Justice, was that it was on property that was not defined, specifically defined in the statute, and certainly unconstitutional as applied to our client. And if you think about it, every day, every... You disagree that this was not a place of public accommodation? Yes. What was it? What would you call it? A private establishment with limited... exactly what Johnson called it. Johnson... So people walk in off the street, they have to be invited, or they just walk in there and eat and drink? I would say, I remember back in law school, there was a thing called business invitees. I would say, yes, they're going to go in there, not necessarily to eat, maybe just to drink. Children are allowed to sit at a bar with their parents, in any kind of liquor establishment. But when you really think about it, in Cook County, Illinois, all over the state of Illinois, all over the country, every single day, there are probably hundreds and hundreds of fights in bars. Why? Because there's liquor there? It could be a very public place. It could be Whitley Field. It could be Guaranteed Rate Field. We have a statute written the way this was, and I know it's been attached to Vegas before, but we're talking about over-breadth. We're talking about why discretion there could be unfairly, capriciously challenged against somebody. And that's what happened here. But the issue is, why is it not a place of public accommodation? Why is it not? Why is a tavern or a restaurant not a public accommodation? I would say it's a place of, as the courts have held, a place of limited, it's a privately owned place of limited accommodation, limited amusement, for whatever these people choose. I mean, there are bars. The amusement of whom? The public? Whoever the private owner believes should be there. Well, so do you take issue with Black's Law Dictionary, which courts commonly go look at? Public accommodation is defined a business establishment that provides lodging, food, entertainment, or other services to the public. That's what Black's Law Dictionary defines it. And we fully understand, and again, I was looking at accommodation and public accommodation, and you know, liquor is nowhere in that definition. Just other forms of entertainment, is that what it means? I mean, does it mean? It goes on to say, as defined by the Civil Rights Act of 1964, one that affects interstate commerce or is supported by state action. Obviously, taverns affect interstate commerce because, as you well know, that was the basis for Hobbs Act extortion, interstate commerce, and state action. I'm sure this establishment was licensed to sell liquor. Mr. Justice Pierce, we agree with that. The question is, what was the intent of the legislature when they passed this bill way back when? Was the intent to prevent serious harm to other innocent people in a public area, whether it be a public sidewalk? Because the way it's interpreted, and the way it's interpreted against my client, is that anywhere a battery is committed now, anywhere, could be and should be and would be an aggravated battery. I mean, except for somebody's house, within somebody's own residence, private residence, everything else is public. There's accommodation for people to go, whether it's a public place, whether it's a public place of accommodation. So everywhere should be an aggravated battery. There's such a wide discretion as to how and who it should be charged against. It can open it up to racial profiling, ethnic profiling, a whole bunch of things that we can't leave to the discretion of individual law enforcement officers. You mentioned the Ward case. The state cites the Ward case and says, what is significant is that the alleged offense occurred in an area accessible to the public. And so it does seem that that's what the court has interpreted the legislature to think. I know that, yes, Mr. Justice, that's the state's argument. However, there's also cases cited by this district and other districts. For instance, I believe it's the Watson case, maybe the Clark case, where somebody was 95, they were making a turn, there was a turnaround off a street, a public highway. They're making the turnaround. All of the public, obviously, it's not blocked off. There's no fences, no gates. Public access is complete, 100 percent. In that case, the courthouse was 95 feet away from the highway, so that would have to be considered as a public place. We have to go by the facts of every single case. And in this particular case, as applied to Mr. Umensky, he was not in a public, he was in the bar part of this alleged restaurant. And, again, if you look at the, when you look at the video, and I'm sure you have, there's nobody sitting around tables eating in a restaurant. It's simply about him. He was in that area when there was nobody else. And as far as danger of other people, in the evidence, the only person, the only person that appears, whether it's other people sitting around the bar, everybody's ignoring what's going on, the only person that got up was somebody who got up and asked the two 300-pound gentlemen to get off of Mr. Umensky because they were on top of him and he couldn't breathe. I guess, Mr. Justice, what we're looking for here is the term we hear all the time and we very seldom use it, and you gentlemen are in a great position to do this. It's a form of fairness. Is it fundamentally fair for a young man like this to go into an establishment and because of a touch that may be insulting or provoking, that he becomes a convicted felon for the rest of his life? Is that the right thing? Let's move on to a point that you're touching on there. In your brief, you said that this is a criminalization of protected behavior. So how do you come to define Mr. Umensky's behavior as protected? I think we're referring to, Mr. Justice, again, he was using offensive language. He was complaining about his treatment and service. When the trial court opened... Did you have people poking each other, probably doing more than that, but ultimately they're on the floor? We go back to the poking. Wrestling around with each other. I mean, what is that, protected behavior? No, the wrestling around. See, one of the findings was that he instigated the whole thing. He instigated things by this horrible language he was using, by the words he was using, by the things he was saying, which are cited in the brief. And what happens, because of those words that he was using, really are protected speech. He gets confronted because of those words. And that's in the testimony, in the record. He gets confronted by Mr. Ramos, I believe, or Mr. Spineca. He gets confronted by them, and that leads, that confrontation then, leads to him being taken to the floor. And there's still a question whether or not there was proof beyond a reasonable doubt of any kind of poke. Two of the state's witnesses, two of their three witnesses, one of the three being the complaining witness, two of the three witnesses said they never saw a contact with a fist, and they never saw a poke. They heard the words, don't poke me, but they never saw it. So it was a question of whether or not there was proof beyond a reasonable doubt that those answers really even occurred. But assuming, arguably, that they did, the protected thing he was doing was speaking his mind. And if they didn't like it, you know, should there be a confrontation? Or should they get on, call 911 and say, please come on over, we want this guy on air. What about when they say that he poked her in the chest or put his hand on his chest in conjunction with the other behavior? Because you talk about who was the initial aggressor. I just, I have trouble with that because it seems like there were a couple of incidents. He started walking away and came back and took a swing. And, but anyway, this initial aggressor, wouldn't the putting the hand or poking in the chest be the initial aggression, especially in conjunction with the other kind? Yes, Justice Griffin. Assuming the argument that that was proven beyond a reasonable doubt that the poke did, in fact, occur, I'd have to agree with the Court that it is a, I guess, an initial aggression. And that's why, in conjunction with the statute, I mean, how is it anticipated that if you're talking to somebody and you poke them in, or maybe slap them on the back in a friendly slap, that that's going to be felonious behavior? That's the problem here. Now, when you think about aggravated, the word aggravated, aggravated battery, we're thinking of a stabbing, we're thinking of some broken bones, somebody hurt seriously. A poking, just because it's in a private establishment like that, becomes a phony? I don't think that's the legislature intended. But, you know, the patting on the back is a little different because the statute says it's physical contact of an insulting or provoking nature with an individual. Patting on the back, you know, as you do in congratulatory, I don't think would be a battery pursuant to the statute. You know, that's … But depending on how somebody interprets it, and that's our point, Mr. Justice, is that this could be interpreted in so many different ways. A slap on the back could be interpreted as insulting to somebody. If you don't like it, somebody comes up to you and slaps you on the back, you're in a place like that, suddenly you've committed a felony? And I think if there's a poking, if there was a poking, proven beyond a reasonable doubt, if there's a poking, is that an initial aggression? Yes, perhaps it is. But that in conjunction with the fact that that makes it a felony, that's when you're saying it's wrong. A long time ago, a judge who all of you know, I'm sure you know or know well from me at least, John Kennedy's second-to-last appointment to the federal bench in 1963, Judge Abraham Lincoln Marovitz, one of my idols, one of my heroes, one of my mentors. And he once said that, you know, there's so many different things you could do as a judge, but the greatest thing you could do as a judge is every single day, every single day your robe is worn, you could do a mitzvah. In the Jewish faith, that's a good deed. You could do a good deed. And what appears in a black-letter law isn't always the just thing to do. And Judge Marovitz was an extremely just person. It was his reputation. What we're asking for in this, and the reason we're doing the appellate court, and I appreciate the fact that you've given us this time to argue this orally, is justice. Under the circumstances of this case, when you review all of the evidence, when you review the law in conjunction with that evidence, it's our position that this young man did not commit a felony, should not have been convicted of committing a felony, and labeled the rest of his life as a felony because of the conduct that night in that bar. It's not what the legislature intended when they created that law. And we're asking for reversal of the findings of the lower court. Thank you. Thank you, sir. Mr. Stiller? May I please declare? The evidence of Defendant's guilt was overwhelming. None of Defendant's arguments call into question the legitimacy of his conviction. Defendant was the instigator here. He was the aggressor. He was not acting in self-defense. When Defendant poked Ramos in the chest, he was highly belligerent. And we can't look at that in just isolation. We have to look at the circumstances that were going on prior to that. Defendant had become extremely upset. He was using highly offensive profanities directed at a young woman. He was making ethnic slurs towards Stednicka. He was making threats to kill Stednicka, making threats to come back and kill his family. This was a person who was becoming increasingly belligerent, and the two managers were trying to defuse the situation. They went over, talked to Defendant, told him he would have to leave. But Defendant refused to leave. He said, I'm not leaving. If Defendant had left, it would have been over with. This case wouldn't be here today. But Defendant insisted on staying, and the situation continued to escalate with his profanities, his threats, his ethnic slurs. When Defendant began to poke at Ramos, that was the first time anyone had physical contact. And the video, which I recently had a chance to view, corroborates the testimony of the State's witnesses. The video shows that the managers were not acting aggressively towards Defendant. They didn't put any hands on him prior to Defendant poking Ramos. They were simply trying to defuse the situation. They gave Defendant ample opportunity to leave the premises. Savannah even returned the disputed money. So Defendant had no reason to stay here. But once he did begin to poke at Ramos and put his hand on his chest, the managers acted reasonably. They had... Well, the bottom line is that the trial judge heard the evidence and decided that based on what he had heard, the elements of the battery were proven. So that's a credibility issue that gets great deference, and we cannot reverse that finding unless it's palpably wrong. The thrust, it seems to me, of the Defendant's argument is whether this was a public place of accommodation. So what's your answer to his argument that it's not? Here is ample evidence that this was a public place of accommodation. Anthony Stavica, the general manager, specifically stated that Twin Peaks was a bar and restaurant that was open to the public. He testified that there were approximately 100 patrons in the bar and restaurant that evening. And you can see from the video, you can see patrons at tables nearby in the bar area. You can see patrons against the bar on stools. And the video is only showing a small portion. It's uncontested it's a bar and restaurant, right? Yes. So what makes that a public accommodation? What do we rely on? The trial court seemed to rely on the Human Rights Act definition of public accommodation. A tavern or a restaurant was that definition. The case of Murphy, which I cited, defines a public place of accommodation or amusement as places where the public is invited to come into and partake of whatever was being offered therein. At Twin Peaks, what was being offered was the service of food and the service of drinks. So that's enough. Yes, as long as the public has access to it. This was not some exclusive private club where you had to be a member. And there was absolutely no evidence of that. And Stavica testified this was open to the public. Can the trial court take judicial notice that a bar or restaurant is licensed by the local municipality or governing authority is licensed by the state? Can they take judicial notice of something like that? Or does it have to be proven? Ultimately, it's a question of fact for the trial court to determine. The trial court, I believe under this situation, the trial court could take judicial notice. However, I believe there is ample evidence even without taking judicial notice whether it was licensed or not because the managers testified that there were families present. This was a family establishment. And I understand Councilman C's argument that maybe someone wouldn't want to bring their family here, but that's really not the issue. The fact is if you wanted to, you could bring your family here. And that's further evidence that this was an establishment that was open to the public. And there's every indication that anyone who wanted to come in here, into this restaurant, could come in and get something to eat. And anyone who was of age could come in and get something to drink. There's absolutely no evidence that this was some type of private club that might forbid the public from coming in. What about Jensen with this washroom? How do you – does it mean that some places are partly open to the public? Well, in Jensen there was a man was stabbed in the bathroom of a tavern. And in that case, the court held that because it occurred in the restroom, the court found that it had not been proven that that was a public place, that particular location, that holding Jensen there never applied to the remainder of the premises. And based on other case law, had this stabbing occurred in the other area of the tavern, it most likely would have been held to be a public place of accommodation. Our position is that even the restaurant would have been a public place because there was nothing barring the members of the public from coming in here, but the court had otherwise. So I don't agree with that holding. However, this offense here clearly didn't happen in a restaurant, so it's factually distinguishable. As the video shows, this happened right in the middle of the bar area. And there were also tables where people were eating. Anthony Spineca testified that he was having a meal at the time when this was happening nearby. So this incident happened directly in the middle of this public place of accommodation. And I would submit that this is a textbook example of why the legislature enacted this aggravating factor, that if you commit a battery in a public place of accommodation, it does warrant a higher penalty because there's a higher risk and possibility that others could get hurt. And it's easy. Fortunately, in this case, no one else did get hurt. However, it's easy to imagine how one of these individuals could have lost their balance and fallen backwards onto a table of patrons or other individuals could have gotten involved, taken sides. There's all types of possibilities where members of the public could get hurt. So this statute is all about public safety. It's designed to reduce the risk of harm to the public. That's why there's a higher penalty here. And the trial court recognized this. The trial court even noted in its findings that the law makes a lot of sense because when you have a battery occurring in a public area,  it could escalate. So it makes a lot of sense that the legislature enacted this law. As far as the battery itself, I would just add that it was far more than just a poking. Ramos suffered serious injuries. He sustained a concussion. He sustained a broken finger, a broken nose. Well, the trial court merged count two into count three. Count two was great bodily harm in a place of public accommodation. Count three was a battery consisting of insulting and provoking conduct in a place of a public accommodation. So are we to consider this case with respect to proving both counts, or should we just focus on count three because that was the count that he was sentenced on? Your Honor, the webinar appeal does not contain the reported proceedings from the sentencing hearing. So it's not entirely clear exactly which count he was sentenced on. It says that the criminal disposition sheet states count two merges into count three. Are you saying that's incorrect? Your Honor, that, based on this evidence here, I would say without having the benefit of the trial court's actually pronouncements in the transcript of the proceeding from the sentencing hearing, it's not entirely clear. And based on the record not being complete, I believe that any— What was sentence centered at? What count? He was sentenced to 45 days of jail, right? Yes. On what count? Again, the record's not entirely clear. However, I believe it would be the battery count based on bodily harm because that is the more serious offense here. Why is it the more serious offense to hold the past three felons? That's correct. However, when you look at the injuries that occurred here, I would submit that we have to look at it on a case-by-case basis. When you look at the injuries here— This is the case before us. The state is arguing for us to affirm the judgment of the trial court. My understanding, I don't know if the other justices understand it the same way, My understanding is Judge Martin entered judgment on count three. He merged count two into count three, found him not guilty of count one. So what is it? That's the job of the state to inform the court clearly of what judgment they're seeking to affirm. Our position is that the record on appeal is incomplete and any doubts arising from the incomplete record should be resolved against the defendant. However, even if the defendant was sentenced on count three, the conviction still stands. It's still proper because the trial court clearly found that the state had proved beyond a reasonable doubt that the defendant was guilty of both types of battery, battery based on battery charge. My initial question was, because he merged count two and count three, which is my understanding, should we consider the sufficiency of the evidence with respect to only count three? Count two and three? What? Because it seems to me that if the evidence is insufficient as to count three, you still may have a valid conviction under count two that might require remandment for resentencing, but maybe not. Or we don't even have to consider count two because count three was proven beyond a reasonable doubt to the satisfaction of the trial court. So that's why I'm asking. You're representing the state? Yes. In this case, the court should consider the sufficiency of the evidence for both counts because both types of battery occurred here. The trial court specifically found that the evidence was sufficient to prove both a battery based on bodily harm and a battery based on physical contact of an insulting or provoking nature. And clearly, even if clearly there is bodily harm here, but as far as count three, the physical contact of an insulting or provoking nature, there is clearly physical contact here. And it wasn't just a poking. Once he was on the ground, the defendant was kicking, doing more poking, grabbing, biting. This was more than sufficient evidence. There was an abundance of evidence that the defendant's conduct was unlawful here. And clearly, whether you look at count two, battery based on bodily harm, or count three, battery based on physical contact of an insulting or provoking nature, the evidence is overwhelming. And the trial court made credibility findings here. The trial court found that both of the managers had testified credibly.  And still the trial court found, as to both counts, that the state had proved beyond reasonable doubt that the defendant committed a battery and had disproved that the defendant had acted in self-defense. So I would submit that this court should look at the sufficiency of the evidence for both counts, both count two and count three. And I would submit that the evidence is overwhelming. And when a rational trial of fact looks at this evidence in the light most favorable to the state, clearly they could have found the elements of aggravated battery beyond a reasonable doubt. For all of these reasons, as well as those stated in our brief, people respectfully request that this honorable court affirm the defendant's conviction for aggravated battery. Thank you. Thank you. Mr. Amirani, any rebuttal? Thank you, Mr. Justice. If you may, please, the court, counsel. To answer the court's query about whether the state proved this a public place of accommodation beyond reasonable doubt, the very loud, clear answer to that is no, absolutely not. If you look at the record, it's void of any proof that this is a public place, other than some hearsay from the victim. Counsel, please. I'm sorry, Justice? Please. You're in a restaurant. Hundreds of people. This isn't just a washroom, all right? There's ruckus with the bartender. Foul language. There are hundreds of people in this restaurant location. The defendant's causing a ruckus. They get involved in a scuffle with another party. They're wrestling around on the floor. To say this is not a public place belies the facts. Well, Mr. Justice, I think we have to look at, number one, the intent of the legislature and the history of our case law in the state of Illinois. And even very clearly, there's a conflict among the districts. This issue has never been decided by our Supreme Court of Illinois, as far as I know. And there's a conflict as far as how tavern is described, how public place of accommodation is defined by the various districts. And interestingly enough, with a case that the state relied upon, the Murphy case, they relied heavily upon that. I quote from that case, while we doubt, quote, while we doubt that a fight in a bar should be characterized as felonious, nevertheless, the statute appears to go that way. So that's why it's very important when we think about whether or not the state has proven, beyond a reasonable doubt, every element of the offense of a public place. Can we assume, like Justice Pierce asked, can the court take judicial notice? I say to the court, you can't. The trial court cannot take judicial notice of a restaurant or a bar being a public place. The state needs to introduce proof of that. All of you gentlemen have had a great deal of experience here. When you go to trial, you have to connect those dots, especially when the defendant is innocent, presumed to be innocent, and the state needs to prove the defendant guilty beyond a reasonable doubt. We can't make any assumptions. We can't use hearsay to prove those things. Where's the charter? Was this a private restaurant? There's a lot of restaurants that serve food establishments. There's male clubs, there's adult clubs, there's different places like that. How do we know it was named Twin Peaks? If you look at the video, which, again, I'm sure you have, there's no hundreds of people in there at tables eating. It's a bar. It's a bar. But the testimony was that there were hundreds of people eating and hundreds of people... Do we know? Could the court guess away my client's innocence? They say, oh, yeah, well, it's a public place. And I think that's why Johnson is so important, Mr. Justice, because, and I quote specifically from Johnson, we believe, and this is a First District case, we believe the intent of the legislature, as expressed in the language of the statute, is not to include a tavern restaurant within the subsection of the statute. We're going to say a tavern is private property open to the public for a limited purpose. To include tavern restaurant within the definition of public property or public place of accommodation or amusement would not comport with the legislative intent of the statute. That is very clearly decided and held by our First District Court. And I know what you're thinking, that the appellate court is one unified appellate court. That's what our Constitution says. However, there is some authority, and it's an Illinois Supreme Court case. It's a civil case, Alexson v. Village of Round Lake, 176, Illinois 2nd, 82, a 1997 case, which held that where there was a conflict, then the appellate district, and this is a First District decision, is allowed to follow their own district's reasoning and holdings. And I submit to this court that the first Do we follow this panel's reasoning? Do we have to follow a First District case? No, under our Constitution, Mr. Justice, we're a unified appellate court. You could certainly follow any of the districts, or your own. Because this is really a case of first impression. Our Supreme Court has never made a definitive rule. There's opinions that go each and every way. But interestingly enough, even these opinions that the state has cited, the courts are very reluctant to say, well, this should be formless conduct. Because, you know, it shouldn't, again, unless every single element is proven, Mr. Justice Harris. A private place, was it a key card place? We don't know that. The defendant doesn't have to prove it. The defendant's innocent. We don't have to prove whether or not this is not a private place. We don't have to prove a negative. This is not a public place. The state has the entire burden to prove it. Your Honor, counsel, here the state presented evidence that Twin Peaks was a public place of accommodation. A case called People v. Murphy states, court can determine the term applied generally to places where the public is invited to come into and partake of whatever is being offered. This comports with a prior case, People v. Ward, where the public nature of the premises is what is significant is that the alleged offense occurred in an area accessible to the public. Here, with the study testified, Twin Peaks was, quote, open to the public and there were probably 100 patrons present. My staff has viewed the video in this case. The video confirms that members of the public can be seen sitting at the bar, at tables, at booths in the area while also moving freely through the aisles. Yes, Mr. Justice, I agree. That's what the video shows, I tell you. It shows a bar with patrons sitting at the bar. It doesn't show a restaurant with families and hundreds of people sitting at tables eating. It's a two-tiered bar and there was people and the only person that got off of a bar stool was to go over to try to help my client who was laying on the floor under 600 pounds of weight. That's what happened there. So how do we even know there was a restaurant? Because the victim whose embellished testimony in so many other ways said things that didn't exist and that conflicted with the other witnesses, how do we even know there was a restaurant there? You know what? It's not the defense's job to prove that there isn't. It was the state's job to prove that there was. And just by the hearsay testimony of the victim, maybe it's some evidence, Mr. Justice, but it's not what is required under our precious Constitution that's proof beyond a reasonable doubt. In order to convict Mr. Umensky of a felony, it is our position that the state needed to prove every single element, including if you believe the public place of accommodation is properly in the statute and it's not overbought, the stuff to prove that it is beyond a reasonable doubt. We can't guess it. Otherwise, if we go according to the state's logic, everything other than our house is a public place or a public place of accommodation. Is that true? Is that where we want the law to go? To leave it in the hands of total, unbridled, deprecious and arbitrary discretion in the hand of a law enforcement officer or perhaps the owner of a private club that wants people out of his club? I don't think that's what we want. And for all those reasons, Mr. Justices, we are asking that you reverse the felony conviction imposed. Thank you. Thank you very much. On behalf of my fellow justices, we'd like to thank the attorneys for their briefing on this interesting subject. And we take the matter under a bite. Court stands in recess.